UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

GOLD CLUB-SF, LLC,

              Plaintiff,

    v.

PLATINUM SJ ENTERPRISE and PML
CLUBS, INC.,

              Defendants.

Case No.  13-cv-03797-WHO

**ORDER DENYING MOTION FOR A
PRELIMINARY INJUNCTION**

Re:  Dkt. No. 13

## INTRODUCTION

Plaintiff Gold Club-SF, LLC ("plaintiff"), moves for a preliminary injunction against defendants PML Clubs, Inc. ("PML Clubs"), and Platinum SJ Enterprise ("Platinum SJ") on the basis of trademark infringement, trademark dilution, and a violation of California's Unfair Competition Law.[1]  The plaintiff argues that the defendants are using marks that are confusingly similar to its own protected marks and seeks to enjoin them from doing so.  Based on the record presented, the parties' briefs and argument, and for the reasons below, the motion for a preliminary injunction is DENIED.

## BACKGROUND

### I.      HISTORY OF GOLD CLUB-SF

Solid Gold, Incorporated ("Solid Gold"), has been in existence since at least 1992.[2]  Furnelli Br. Decl. ("FBD") ¶ 2.  Around 1995, it opened the Gold Club gentlemen's club and

---

[1] The plaintiff initially moved for a temporary restraining order, but after conferring with the parties, the Court set the motions on a schedule for a preliminary injunction.  PML Clubs intervened on September 4, 2013.

[2] However, the plaintiff's timeline attached to its reply brief states that Solid Gold was not incorporated until 1994.

United States District Court
Northern District of California

restaurant at 650 Howard Street, San Francisco, California ("Gold Club-SF"), and began operating under the GOLD CLUB name and mark. FBD ¶ 3. Solid Gold began advertising the Gold Club-SF "in most of the major print publications distributed in the San Francisco Bay Area, including the *San Francisco Chronicle.*" FBD ¶ 4. It also began promoting the Gold Club-SF through a website, www.goldclubsf.com, and on approximately 50 to 70 taxicabs in San Francisco. FBD ¶¶ 5-6. At the time of its sale in 2004, "[m]ost of the Gold Club-SF's clientele came from the Bay Area. FBD ¶ 14.

Around the time that Gold Club-SF opened, Richard Furnelli, a "consultant" for Solid Gold, received a telephone call from Steve Kaplan, the principal owner of a gentlemen's club and restaurant located at 2416 Piedmont Road, N.E., Atlanta, Georgia ("Gold Club-Atlanta"), that was also operating under the name and mark of GOLD CLUB. FBD ¶¶ 2, 7. Kaplan allegedly "disavowed any interest in operating in California . . . and did not object to Solid Gold's operating under the GOLD CLUB name or mark." FBD ¶ 8. "Kaplan never visited the Gold Club-SF, never inquired about the status of the Gold Club-SF, and never asked about the Gold Club-SF's use of the GOLD CLUB name or mark." FBD ¶ 9. Furnelli claims that he was not aware that there was a Gold Club in Atlanta when Solid Gold selected the GOLD CLUB name for Gold Club-SF. Furnelli Reply Decl. ("FRD") ¶ 2. He says that Solid Gold "independently came up with the name and mark GOLD CLUB" and "chose this name and mark at random." FRD ¶ 2. He has never spoken with anyone from Gold Club-Atlanta, or any of its related entities or persons, except for this phone call. FRD ¶ 3.

In January 2004, Solid Gold sold all of the assets and transferred by written agreement all "intangible property" of the Gold Club-SF to the plaintiff. FBD ¶¶ 2, 13; Joseph Carouba Brief Decl. ("JCBD") Ex. 1. Until then, Solid Gold "continuously operated" Gold Club-SF under the GOLD CLUB name and mark "without interruption or disturbance," and advertised the club "throughout the nine-county San Francisco Bay Area" using that name and mark. FBD ¶¶ 11-12. The plaintiff alleges that it "does not have a trademark license from PML Clubs, [] or any other entity for the Gold-Club SF marks." JCBD ¶ 21. "In the lead up to Plaintiff's purchase of the San Francisco club, [the plaintiff's manager] saw no evidence to indicate that Solid Gold was

operating under a 'license' to use the GOLD CLUB name or any of the Gold Club-SF Marks."

JCBD ¶ 21.  Since the plaintiff's purchase of Gold Club-SF, PML Clubs has no relationship with

the plaintiff, nor has PML Clubs "inspected the quality of services" at Gold Club-SF.  JCBD

¶¶ 22-23.  To the best of the manager's knowledge, no one from PML Clubs has ever entered Gold

Club-SF.  JCBD ¶ 23.

After buying Gold Club-SF, the plaintiff continued using the website and has "expanded

its functionality," including selling merchandise online, having a blog and media gallery, running

a mailing list, and engaging with social media outlets.  JCBD ¶ 8.  The plaintiff also employed a

full-time marketing person.  JCBD ¶ 9.  The club advertises in "major print publications" in the

Bay Area, as well as through digital advertisers (e.g., SFGate, Google Adwords, Examiner.com,

and SF Station), targeting Santa Clara and San Mateo counties, from which it has customers.

JCBD ¶¶ 10-11; Joseph Carouba Reply Decl. ("JCRD") ¶ 5.  Gold Club-SF's annual patronage

has grown from 60,000 customers in 2004 to over 100,000 in 2012.  JCRD ¶¶ 2-3.  It was voted

the SF Weekly's "Best Gentlemen's Club" in 2011, 2012, and 2013.  JCBD ¶ 18.

"The advertising and promotion of the San Francisco Gold Club since January 2004 is

derived from the advertising and promotion of the club" since 1995, including use of the GOLD

CLUB mark and lion-and-spear design.  Nicholas Carouba Supp. Decl. ¶ 6.  Nicholas Carouba—

the "custodian of records for Plaintiff with regard to the archived advertising and promotional

materials" for Gold Club-SF—has been unable to find any advertising or promotional materials

from 1995 to 2004 for Gold Club-SF.  Nicholas Carouba Br. Decl. ("NCBD") ¶ 3.  However, the

records he has found show that the plaintiff has spent significant amounts of money on advertising

and promotion from 2004 through at least 2010.  NCBD ¶¶ 4-10.  In 2004, he contacted two San

Jose newspapers about running advertisements for Gold Club-SF; however, both newspapers

refused to run ads for gentlemen's clubs.  NCBD ¶¶ 6-7.  Nicholas Carouba "confirmed several

years later that this was still the policy" of one of the newspapers.  NCBD ¶ 7.

While Gold Club-SF has held anniversary parties since 2004, Nicholas Carouba claims that

Gold Club-SF's anniversary celebrations "do not relate to the date of the original opening of Gold

Club-SF.  Rather, these anniversary parties merely celebrate the number of years since 2004 when

United States District Court
Northern District of California

3

Plaintiff took over the ownership and management of the Gold Club-SF from Solid Gold, Incorporated." NCBD ¶ 12. Further, "[t]he specific dates on which these celebrations took place were arbitrary and did not correspond to the dates that Plaintiff actually purchased or began managing the San Francisco Gold Club." NCBD ¶ 12.

## II.   HISTORY OF PML CLUBS

PML Clubs licenses "THE GOLD CLUB" name to various gentlemen's clubs. Goodman Decl. in Opp'n ("GDO") ¶ 13. The first Gold Club allegedly related to PML Clubs was opened in 1987 in Atlanta, Georgia. GDO ¶ 2. On November 14, 1989, Entertainment Systems, Inc., registered a trademark for "THE GOLD CLUB" ("the '544 trademark") with the United States Patent and Trademark Office ("PTO"); the registration reflects that the word mark was first in use and in commerce on October 2, 1987. Guillot Decl. Ex. 3. On December 14, 1992, Entertainment Systems recorded a November 16, 1992, assignment of its interest in the mark to the Entertainment Corporation of America ("ECA"). Guillot Decl. Ex. 4; *see also* GDO ¶ 2. On the same day, ECA registered a service mark with two griffins and a staff topped with a fleur-de-lys over the words "THE GOLD CLUB" ("the '027 trademark") with the PTO; the registration reflects that the mark was first in use on April 1, 1992, and in commerce on June 1, 1992. Guillot Decl. Ex. 5.

The Gold Club-Atlanta was "highly successful," so the owner of ECA, John Kirkendoll, opened a number of "authorized 'Gold Club'" clubs in Miami Beach, Florida; New York, New York; New Orleans and Baton Rouge, Louisiana; and Houston and Dallas, Texas. GDO ¶ 3. All were built by Kirkendoll, although the declarant cannot recall if each was owned directly by ECA or by a separate company and was managed by Kirkendoll. GDO ¶ 3. It is unclear when each club was founded and operated.

Because ECA's business expanded so rapidly, but experienced financial difficulties, it turned to Steve Kaplan, chief executive officer of National Entertainment Systems, Inc., for financing. GDO ¶ 4. Kaplan agreed to provide funding in exchange for an equal interest with Kirkendoll in his business. GDO ¶ 4. The relationship soured, and Kaplan and Kirkendoll, as well as their respective "companies," entered litigation, but they reached a settlement in which

4

National Entertainment Systems paid several million dollars to Kirkendoll's companies in exchange for exclusive ownership of "THE GOLD CLUB" marks and the Gold Club-Atlanta. GDO ¶ 4. However, National Entertainment Systems licensed the marks to Kirkendoll and his clubs, so they continued using them. GDO ¶ 4.

In 1994, Lyle Goodman, Kaplan's cousin, began overseeing the startup operations of new "Gold Club" establishments outside of Atlanta and "serve[d] as a contact person for those seeking to use 'THE GOLD CLUB' marks at their gentlemen's clubs." GDO ¶ 5. Goodman claims that, with Kaplan's permission, he licensed use of "THE GOLD CLUB" to businesses in several other cities, such as Hartford, Connecticut, and Washington, D.C. GDO ¶ 5. "[S]everal contacts with members of the Furnelli family[] resulted in licenses to use the marks for a gentlemen's club in San Francisco, and later, in Chicopee, Massachusetts." These two licenses, as well as the one in Hartford, Connecticut, "were initially issued on a royalty-free basis, under oral agreements terminable at will." GDO ¶ 5.

Specifically, Goodman claims that "sometime in 1995, [he] spoke with Richard Louis Furnelli (Jr.), who sought permission to use 'THE GOLD CLUB' marks for a new gentlemen's club at 650 Howard Street in San Francisco, on behalf of Solid Gold Incorporated, a corporation led by Elizabeth Furnelli, who [he] believe[s] was Mr. Furnelli's sister." GDO ¶ 6. With Kaplan's approval, Goodman "issued a nonexclusive, nontransferable, royalty-free license to Solid Gold, permitting it to use the marks at this San Francisco location." GDO ¶ 6. He alleges that he "visited the establishment in 1996, after it opened, to inspect the premises and review and sample the services provided under the marks." GDO ¶ 6. Two years later, Goodman spoke with Richard Louis Furnelli, Sr., "and granted a similar oral, nonexclusive, nontransferable license to another company controlled by Ms. Furnelli, to use 'THE GOLD CLUB' marks for a gentlemen's club planned for Chicopee, Massachusetts, where Mr. Furnelli (Sr.) resided." GDO ¶ 7. The Chicopee club opened briefly, but after failing to receive a liquor license, it closed and the use of "THE GOLD CLUB" mark ended. GDO ¶ 7.

Furnelli alleges that he does not know anyone by the name of Lyle Goodman, nor does he recall ever meeting or speaking with such a person. FRD ¶ 4. To the best of his knowledge, no

United States District Court
Northern District of California

5

1   such person ever visited Gold Club-SF.  FRD ¶ 4.  Furnelli is only "generally aware of talk about a

2   Gold Club located in Chicopee, Massachusetts."  FRD ¶ 5.

3          Furnelli says that his son, Richard Furnelli, Jr., was born in 1959.  FRD ¶ 6.  Around 1979,

4   his son "had a venous malfunction in the center of his brain" and underwent neurosurgery, "which

5   required the removal of a large portion of his brain," leaving him "severely disabled and, among

6   other things," "great difficulty speaking."  FRD ¶ 6.  Thus, in 1995, "it would not have been

7   possible for Lyle Goodman (or anyone else) to have a coherent conversation with Richard Jr.

8   regarding any business matter pertaining to the San Francisco Gold Club."  FRD ¶ 7.  Richard Jr.

9   has never been employed, and has "never had knowledge with regard to the business affairs of

10  Solid Gold or the San Francisco Gold Club."  FRD ¶ 8.  To be sure, he "never had the capacity or

11  authority to represent" those entities "or to enter into agreements" on their behalf.  FRD ¶ 8.

12         In response, Goodman admits that "this conversation occurred so many years ago, and was

13  brief, [so] it may be that I was mistaken about which Richard Furnelli I spoke with.  However, if

14  so, then it was Richard Furnelli, Sr. with whom I spoke."  Goodman Supp. Decl. ("GSD") ¶ 6.

15  Goodman now remembers that, in addition to Furnelli's alleged association with the Chicopee

16  club, Furnelli or his family was also involved in THE GOLD CLUB in Hartford, Connecticut,

17  where Goodman also gave permission to use the GOLD CLUB marks.  GSD ¶ 6.  "Thus, [he is]

18  confident that Mr. Furnelli, and other members of his family, were aware of [him], Mr. Kaplan,

19  and National Entertainment Systems, as well as National Entertainment Systems' [sic] ownership

20  of 'THE GOLD CLUB' marks, when their use of these marks began in San Francisco, Hartford,

21  and Chicopee."  GSD ¶ 6.

22         The '544 trademark was canceled on May 20, 1996.  Tuzin Decl. Ex. D.  The '027

23  trademark was canceled on July 3, 2000.  Tuzin Decl. Ex. E.

24         Despite being extremely lucrative, after various criminal scandals, the Gold Club-Atlanta

25  closed on August 1, 2001.  GDO ¶ 8.  However, National Entertainment Systems continued to

26  license "THE GOLD CLUB" marks and was not "dissolved immediately following the Atlanta

27  Club's closure."  GDO ¶ 9.  On the day that the Atlanta Gold Club closed, Goodman claims that

28  Kaplan "assigned all rights in 'THE GOLD CLUB' marks to Pat DeMone," effective August 2,

United States District Court
Northern District of California

6

1    2001.  GDO ¶ 10.  Although Kaplan allegedly offered "Atlanta Gold Club furnishings" to

2    DeMone and Kaplan, they declined; it is unclear what happened to National Entertainment

3    Systems thereafter.  GDO ¶ 10.  Between 2001 and 2004, Goodman alleges that he and DeMone

4    attempted to open a flagship "Gold Club" establishment in Philadelphia, but their efforts failed.

5    GDO ¶ 11; Rose Decl. ¶ 3.  In March 2004, they found a location and licensee in Philadelphia, and

6    opened THE GOLD CLUB.  GDO ¶ 11.

7         After learning that "the original federal registrations for 'THE GOLD CLUB' marks had

8    lapsed," DeMone filed a new application to register the "THE GOLD CLUB" word mark on

9    August 13, 2001 ("the '304 trademark").[3]  GDO ¶ 11; Guillot Decl. Ex. 1.  However, the

10   registration reflects that the trademark's "first use [] in commerce" was not until March 4, 2004,

11   and it was officially registered on June 8, 2004.  Guillot Decl. Ex. 1.  DeMone then "undertook

12   monitoring and enforcement efforts for 'THE GOLD CLUB' mark, sending demand letters to

13   gentlemen's clubs attempting to capitalize on the Atlanta Gold Club's residual goodwill, fame,

14   and notoriety."  GDO ¶ 11.  DeMone later hired Michael Rose to market "THE GOLD CLUB"

15   brand to licensees in other cities.  GDO ¶ 11.

16        Goodman claims that he and DeMone "continued to honor the existing licenses issued by

17   National Entertainment Systems . . . including the licenses for San Francisco and Chicopee, and all

18   of which [he] remained aware of."  GDO ¶ 12.  However, they were not aware that the ownership

19   of Gold Club-SF had changed and that Solid Gold no longer owned it.  GDO ¶ 12.  Upon

20   information and belief, the Gold Club-SF's website did not reflect the change until "sometime in

21   2006," nor was Goodman, DeMone, "or, upon information and belief, counsel for National

22   Entertainment Systems" aware of this change.  Rose Decl. ¶ 9.  Goodman and Rose say that they

23   "did not learn of the change in ownership at the San Francisco Gold Club until June 1, 2012, in

24   _____

25   [3] This trademark was deemed "incontestable" under the Lanham Act on July 24, 2009.  Guillot
     Decl. Ex. 2.  That status means that "the registration shall be conclusive evidence of the validity of

26   the registered mark and of the registration of the mark, of the registrant's ownership of the mark,
     and of the registrant's exclusive right to use the registered mark in commerce."  15 U.S.C.

27   § 1115(b).  However, an incontestable registered trademark does not eliminate the trademark
     rights of an earlier common-law holder of the same mark and is still subject to infringement

28   claims.  *Id.*

United States District Court
Northern District of California

connection with a successful demand letter to a different party infringing 'THE GOLD CLUB' word mark. Within a few days of acquiring this knowledge, Gold Club-SF was notified of its potential violations." GDO ¶ 12; Rose Decl. ¶ 9. Gold Club-SF did not respond. Rose Decl. ¶ 9.

In late 2007, DeMone, Rose, and Goodman "decided to formalize [their] longstanding working relationship" and "organized PML Clubs, Inc., for the purpose of licensing and enforcing 'THE GOLD CLUB' marks." GDO ¶ 13. Through counsel, they "continued to monitor for adverse uses of confusingly similar marks." GDO ¶ 13. PML Clubs has enforced its rights through legal proceedings and written demands. GDO ¶ 13. It "continued to locate and enter agreements with new licensees . . . and PML now has license agreements with gentlemen's clubs" in Pennsylvania, North Carolina, South Carolina, New Hampshire, Delaware, Florida, Connecticut, California, and Nevada. GDO ¶ 13; Rose Decl. ¶¶ 7-8.

## III.   SAN JOSE GOLD CLUB

On June 14, 2013, PML Clubs and Platinum SJ entered into a written license agreement in which PML authorized Platinum SJ to use its "THE GOLD CLUB" mark. Guillot Decl. Ex. 13.

In July 2013, the plaintiff "was contacted by several people misled into believing that the San Jose Gold Club was affiliated with the Gold Club-SF." JCBD ¶ 13. The plaintiff cites to Exhibits B and C of Joseph Carouba's brief declaration, but those exhibits merely show that two individuals wanted to ask the plaintiff questions about San Jose Gold Club, not that they necessarily confused Gold Club-SF with San Jose Gold Club. JCBD Exs. B, C. The plaintiffs also show evidence that someone with the Instagram handle of alissaraeross_ alleged that another Instagram user, mikentribe, told her that San Jose Gold Club is affiliated with Gold Club-SF. JCBD Ex. D. The plaintiff attributed the alleged comment by mikentribe to either Platinum SJ Enterprise or its agent. JCBD ¶ 14.

San Jose Gold Club opened on August 8, 2013. JCBD ¶ 16, Ex. E. The plaintiff has never granted to Platinum SJ Enterprise a license to operate a Gold Club in San Jose using the plaintiff's marks "or confusingly similar marks." JCBD ¶ 17.

### PROCEDURAL HISTORY

On August 15, 2013, the plaintiff filed its complaint. Dkt. No. 1. The complaint contains

three causes of action:  (1) trademark infringement under Section 43(a) of the Lanham Act, 15

U.S.C. § 1125(a); (2) trademark dilution under 15 U.S.C. § 1125(c); and (3) violation of

California's Unfair Competition Law, CAL. BUS. & PROF. CODE § 17200 *et seq.*  On August 21,

2013, the plaintiff moved for a temporary restraining order and preliminary injunction.  Dkt. No.

13.

**LEGAL STANDARD**

**I.      PRELIMINARY INJUNCTION**

        "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be

granted unless the movant, *by a clear showing*, carries the burden of persuasion."  *Mazurek v.

Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted) (original emphasis).  "A plaintiff seeking a

preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to

suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his

favor, and that an injunction is in the public interest."  *Winter v. Nat'l Res. Def. Council, Inc.*, 555

U.S. 7, 20 (2008).  "Alternatively, if the moving party can demonstrate the requisite likelihood of

irreparable harm, and show that an injunction is in the public interest, a preliminary injunction

may issue so long as there are serious questions going to the merits and the balance of hardships

tips sharply in the moving party's favor."  *Graham v. Am. Home Mortg.*, 13-cv-03322-RS, 2013

WL 3989676, at *1 (N.D. Cal. Aug. 2, 2013) (citing *Alliance for Wild Rockies v. Cottrell*, 632

F.3d 1127, 1131 (9th Cir. 2011)).  "[T]hese two alternatives represent extremes of a single

continuum, rather than two separate tests.  Thus, the greater the relative hardship to the moving

party, the less probability of success must be shown."  *Bernhardt v. Los Angeles Cnty.*, 339 F.3d

920, 925 (9th Cir. 2003).

        "The essence of trademark infringement is the likelihood of confusion, and an injunction

should be fashioned to prevent just that."  *Internet Specialties W., Inc. v. Milon-DiGiorgio Enters.,

Inc.*, 559 F.3d 985, 993 (9th Cir. 2009).  "Preventing consumer confusion serves the public interest

and there is a strong policy in favor of protecting rights to trademarks."  *Stark v. Diageo Chateau

& Estate Wines Co.*, 907 F. Supp. 2d 1042, 1067 (N.D. Cal. 2012).

9

## II.     TRADEMARK INFRINGEMENT

To prevail on a claim of trademark infringement under the Lanham Act, a party "must prove:  (1) that it has a protectable [sic] ownership interest in the mark; and (2) that the defendant's use of the mark is likely to cause consumer confusion." *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1144 (9th Cir. 2011).  "[A] plaintiff trademark owner must establish a valid, protectable interest in order to proceed to the second prong of the trademark infringement analysis—the likelihood of confusion resulting from the defendant's alleged infringing use." *Applied Info. Scis. Corp. v. eBAY, Inc.*, 511 F.3d 966, 972 (9th Cir. 2007).

"[T]he standard test of ownership is priority of use.  To acquire ownership of a trademark it is not enough to have invented the mark first or even to have registered it first; the party claiming ownership must have been the first to actually use the mark in the sale of goods or services." *Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1219 (9th Cir. 1996).  Federal registration of a trademark is prima facie evidence that the registrant is the owner of the mark.  15 U.S.C. § 1057(b).  "Therefore, the registrant is granted a presumption of ownership, dating to the filing date of the application for federal registration, and the challenger must overcome this presumption by a preponderance of the evidence." *Sengoku Works*, 96 F.3d at 1219.  "However, the non-registrant can rebut this presumption by showing that the registrant had not established valid ownership rights in the mark at the time of registration—in other words, if the non-registrant can show that he used the mark in commerce first, then the registration may be invalidated." *Id.* at 1220.  "The first to use a mark is deemed the 'senior' user and has the right to enjoin 'junior' users from using confusingly similar marks in the same industry and market or within the senior user's natural zone of expansion." *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1047 (9th Cir. 1999).

"A party asserting common law rights must not only establish that it is the senior user, it must also show that it has 'legally sufficient market penetration' in a certain geographic market to establish those trademark rights." *Credit One Corp. v. Credit One Fin., Inc.*, 661 F. Supp. 2d 1134, 1138 (C.D. Cal. 2009).  "Sufficient market penetration is determined by 'examining the trademark user's volume of sales and growth, number of persons buying the trademarked product

United States District Court
Northern District of California

10

in relation to the number of potential purchasers, and the amount of advertising' in a given market." *Id.*

## DISCUSSION

Central to the analysis of the issues in this case is the credibility of the principal declarants on each side concerning purported oral licenses, transfers of same, and other communications. Each side has attempted to besmirch the integrity of the other's declarants. On the state of this record, it is impossible to determine whether it is credible (i) that the chain of licenses (at least one link of which is oral) described by PML Clubs, beginning with Entertainment Systems, Inc., occurred unbroken in the manner and with the scope asserted by the defendants, (ii) that Solid Gold chose a name and mark "at random" that is strikingly identical to the name and mark of Gold Club-Atlanta, and (iii) that the conversation between Kaplan and Furnelli in the mid-1990s did or did not result in an oral license being given to Solid Gold. Because these are material issues, the Court cannot determine whether the plaintiff is likely to prevail in this litigation. Further, the balance of harms does not tip strongly in favor of the plaintiff—if anything, it tips the other way. As a result, the Court denies the plaintiff's motion for a preliminary injunction.

That said, the trademark infringement issues raised by the plaintiff constitute "serious questions" because they are "substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation." *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) (citation omitted). The merits of the causes of action for trademark dilution and violation of the Unfair Competition Law substantially hinge on how the Court analyzes the infringement cause of action. As a result, the Court will discuss it below.

## I.     THE MERITS OF THE PLAINTIFF'S TRADEMARK INFRINGEMENT CLAIM

### A.  There are serious questions about whether the plaintiff has a protectable interest in the trademark.

No party disputes that "GOLD CLUB" is a protectable mark,[4] so the issue is who owns the

---

[4] The Ninth Circuit recognizes "four different categories of terms with respect to trademark protection:  (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful." *Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns, Inc.*, 198 F.3d 1143, 1146 (9th Cir. 1999) (citation

mark or has priority use of it.  *See Brookfield Commc'ns*, 174 F.3d at 1047.  The plaintiff does not

claim to have a federally registered trademark, Br. 18—indeed, its attempt in August 2006 to

register the "GOLD CLUB" mark was rejected by the PTO due to a "likelihood of confusion"

with PML Clubs's registered mark.  Guillot Decl. Ex. 17.  Instead, the plaintiff asserts that it has a

common-law trademark dating from 1995 based on Solid Gold's use of the "GOLD CLUB"

marks.  But if National Entertainment Systems granted Solid Gold an oral license in 1995, as the

defendants claim, then Solid Gold did not establish ownership of the mark under common law by

using the "GOLD CLUB" mark when it opened Gold Club-SF that year.  FRD ¶ 2; JCBD ¶¶ 21,

23; *see Sengoku Works*, 96 F.3d at 1219.

On January 12, 2004, Solid Gold sold Gold Club-SF and all its "intangibles, including, but

not limited to, phone numbers, licenses [], customer lists, business records, marketing materials,

permits, (including conditional use permits), contracts, equipment leases and other intangible

property used by Seller in conducting Seller's Business" to the plaintiff by written assignment.

JCBD Ex. A.  Such a broad assignment would include Solid Gold's entitlement to the trademark if

there was no oral license.  Thus, the plaintiff would have acquired the right to the "GOLD CLUB"

mark in its natural zone of expansion if its version of the story is to be believed.  *Brookfield

Commc'ns*, 174 F.3d at 1047.  As long as the plaintiff continued using it, then it would retain a

common-law trademark for "GOLD CLUB" dating to 1995 and would be the senior user who "has

the right to enjoin 'junior' users from using confusingly similar marks in the same industry and

market or within the senior user's natural zone of expansion."  *Id.*; *see also Dep't of Parks & Rec.

for State of Calif. v. Bazaar Del Mundo, Inc.*, 448 F.3d 1118, 1125-26 (9th Cir. 2006).

_____

omitted).  Along this spectrum, the more arbitrary or fanciful a term is, the more protection it
warrants.  A generic term refers "to the genus of which the particular product or service is a
species," where as a descriptive term literally describes what the product is; the former is not
protectable, but the latter can sometimes be protected.  *Id.*  "A suggestive mark conveys an
impression of a good but requires the exercise of some imagination and perception to reach a
conclusion as to the product's nature."  *Brookfield Commc'ns*, 174 F.3d at 1058 n.19.  "Arbitrary
and fanciful marks have no intrinsic connection to the product with which the mark is used; the
former consists of words commonly used in the English language, whereas the latter are wholly
made-up terms," e.g., Clorox.  *Id.*  Because the term "GOLD CLUB" has no "intrinsic connection"
to gentlemen's clubs, it is an arbitrary term that warrants trademark protection.

United States District Court
Northern District of California

Alternatively, the plaintiff argues that it gained a common-law right to the mark due to its own operation of Gold Club-SF.  It asserts that National Entertainment Systems's marks had lapsed and that the defendants were not using the "GOLD CLUB" mark until March 2004.  The defendants disagree, stating that they are the senior user of the GOLD CLUB mark as a result of PML Clubs's registration of the '304 trademark on August 13, 2001.  Opp'n 1.

The mere fact that the trademark was *registered* does not mean that the defendants have a priority of use from the registration date.  "It is axiomatic in trademark law that the standard test of ownership is priority of use.  It is not enough to have invented the mark first or even to have registered it first; the party claiming ownership must have been the first to actually use the mark in the sale of goods or services."  *Halicki Films, LLC v. Sanderson Sales & Mktg.*, 547 F.3d 1213, 1226 (9th Cir. 2008) (ellipses and brackets omitted); *Applied Info. Scis. Corp.*, 511 F.3d at 970. While a "registrant is granted a presumption of ownership, dating to the filing date of the application for federal registration . . . the non-registrant can rebut this presumption . . . if the non-registrant can show that he used the mark in commerce first . . . ."  *Sengoku Works*, 96 F.3d at 1220.

By the defendants' own admission, they did not use the mark until March 2004, at the Gold Club in Philadelphia.  GDO ¶ 11; *see also* Guillot Decl. Ex. 1.  The face of the '304 trademark reflects that its first date of use in commerce was March 4, 2004.  While the defendants argued at the hearing that they may go to the PTO and change the in-use or in-commerce date with no difficulty or need for any proof, the fact that they themselves documented that March 4, 2004, is their first in-commerce use of the mark—before this litigation occurred and while it was allegedly pursing enforcement of its trademark against others—is telling.

The defendants further argued at the hearing that since they made efforts to use the Gold Club name to open a club in Philadelphia, such efforts should constitute use for the purpose of establishing priority.  While "use" under the Lanham Act "typically occurs when a mark is used in conjunction with the actual sale of goods or services," *Brookfield Commc'ns*, 174 F.3d at 1051, "advertising combined with other non-sales activity" can constitute use, though advertising alone cannot, *Bazaar Del Mundo Inc.*, 448 F.3d at 1126.  Such activity must be "sufficiently public to

1   identify or distinguish the marked goods in an appropriate segment of the public mind as those of

2   the adopter of the mark." *Brookfield Commc'ns*, 174 F.3d at 1052 (citation omitted).

3       On the record before the Court, the defendants were neither advertising nor using the

4   "Gold Club" mark between 2001 to 2004. Rather, they "engaged in a highly-publicized effort to

5   expand '*Signatures*,'" an existing Philadelphia establishment. GDO ¶ 11 (emphasis added). They

6   wanted "to obtain a liquor license transfer *for Signatures*, and to expand the facility, with the goal

7   of transforming it into a 'Gold Club,'" a goal which failed. Rose Decl. ¶ 3 (emphasis added).

8   While the defendants may have intended to eventually open a Gold Club, the purpose of trademark

9   law is to allow consumers to associate the trademark at issue with a particular good or service.

10  Here, the evidence reflects that the defendants were actually advertising another name, and the

11  mere fact that they had a "goal" of opening a Gold Club is insufficient to establish priority of

12  trademark use. As the Ninth Circuit said, "trademark rights are not conveyed through mere intent

13  to use a mark commercially." *Chance v. Pac-Tel Teletrac Inc.*, 242 F.3d 1151, 1158-59 (9th Cir.

14  2001).

15      There are serious questions about whether the plaintiff has a common law right to the

16  GOLD CLUB marks and is the senior user of those marks in the Bay Area. The plaintiff's alleged

17  marks have been in continuous use by Solid Gold since 1995 and were transferred to the plaintiff

18  by *written* assignment in 2004. On the other hand, the '544 and '027 trademarks of PML Clubs's

19  alleged predecessor, National Entertainment Systems, were canceled in 1996 and 2000

20  respectively. Tuzin Decl. Exs. D, E. PML Clubs claim that National Entertainment Systems

21  orally transferred the right to those marks (presumably under common law) to it, but there is no

22  documentary evidence to corroborate this. Even if it occurred, it is not apparent that such a

23  transfer would be valid.[5] And while DeMone and Rose registered the '304 trademark themselves

24  _____

25  [5] The Lanham Act states that a trademark is "assignable with the goodwill of the business in which
    the mark is used, or with that part of the goodwill of the business connected with the use of and

26  symbolized by the mark." 15 U.S.C. § 1060. In interpreting this provision, the Ninth Circuit said,
    "[T]he law is well settled that there are no rights in a trademark alone and that no rights can be

27  transferred apart from the business with which the mark has been associated." *E. & J. Gallo
    Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1289 (9th Cir. 1992) (citation omitted). The court has

28  been clear that "[t]rademark use does indeed require an existing business" "to which goodwill

in 2001, it appears not to have been used in commerce until March 2004 and thus would not have been effective until then.

### B.  There are serious questions about whether the plaintiff's protectable interest includes San Jose.

As the "senior" user of the marks, a plaintiff "has the right to enjoin 'junior' users from using confusingly similar marks in the same industry and market or within the senior user's natural zone of expansion." *Brookfield Commc'ns*, 174 F.3d at 1047.  While neither the Ninth Circuit nor any court in this district has expressly defined "natural zone of expansion," courts will examine "the trademark user's volume of sales and growth trends, the number of persons buying the trademarked product in relation to the number of potential purchasers, and the amount of advertising" to determine the geographic scope of a common-law trademark holder's territory when there is another trademark holder who later registered the same mark.  *See, e.g.*, *Glow Indus., Inc. v. Lopez*, 252 F. Supp. 2d 962, 983 (C.D. Cal. 2002) (citing *Adray v. Adry-Mart, Inc.*, 76 F.3d 984, 989 (9th Cir. 1995)).

The plaintiff argues that San Jose is in the same "market" or "natural zone of expansion" as Gold Club-SF such that the defendants' use of their purported marks in San Jose would violate the plaintiff's protectable interest.  There is reason to believe that this is true.  The plaintiff has provided evidence that its customer volume has grown over the years, that it draws increasing numbers of customers from Santa Clara County (where San Jose is located), and that it has attempted to target advertising at customers in San Jose.  JCBD ¶¶ 10-11; JCRD ¶¶ 2-3, 6-7, Ex. B.  It advertises in print and digital publications with bases in Santa Clara County, JCBD ¶ 11, and its advertising spending has increased year-over year, Nicholas Carouba Reply Decl. ¶ 5.  The

could attach." *Electro Source, LLC v. Brandess-Kalt-Aetna Grp., Inc.*, 458 F.3d 931, 939 (9th Cir. 2006).  Here, Goodman only alleges that "Kaplan, still CEO of National Entertainment Systems, assigned all rights in 'THE GOLD CLUB' marks to Pat DeMone," and he intended to open a club in Philadelphia.  GDO ¶ 5.  There was no explicit assignment of good will, or even an implicit one.  *See E. & J. Gallo Winery*, 967 F.2d at 1289 (citing with approval *Money Store v. Harriscorp Fin., Inc.*, 689 F.2d 666, 676 (7th Cir. 1982)).  Gold Club-Atlanta was shut down by federal authorities and the business no longer existed during the purported assignment, nor was anything else transferred along with the otherwise naked trademark.  Without a transfer of good will along with the trademark, the purported assignment may be invalid under the Lanham Act.

United States District Court
Northern District of California

plaintiff admits that it was not successful in advertising in two San Jose newspapers, Nicholas
Carouba Reply Decl. ¶ 6-7, but newspapers are only one avenue for advertising, and the plaintiff
has shown that it has targeted Santa Clara County through other means.

### C.   There are serious questions about whether the defendants are infringing on the plaintiff's protectable interest.

"The core element of trademark infringement is the likelihood of confusion, i.e., whether
the similarity of the marks is likely to confuse customers about the source of the products."
*Brookfield Commc'ns*, 174 F.3d at 1053.  To determine whether there is a likelihood of confusion,
the Ninth Circuit applies the eight *Sleekcraft* factors:  "similarity of the conflicting designations;
relatedness or proximity of the two companies' products or services; strength of [the] mark;
marketing channels used; degree of care likely to be exercised by purchasers in selecting goods;
[the alleged infringer's] intent in selecting its mark; evidence of actual confusion; and likelihood
of expansion in product lines."  *Id.* at 1053-54.  Here, both the "GOLD CLUB" name and service
marks are nearly identical, and neither party disputes that they are confusingly similar—indeed,
the defendants concede that the marks are "confusingly similar" in claiming that it is the plaintiff
who is infringing on their marks.  Opp'n 1.  While federal registration would afford PML Clubs
trademark protection throughout the rest of the country, the plaintiff's concurrent right in its
natural zone of expansion would be carved out if its common law mark predates PML Clubs
national mark.  *Brookfield Commc'ns*, 174 F.3d at 1047.

The defendants claim that because they licensed the marks to Solid Gold, Solid Gold could
not have assigned them to the plaintiff.  Opp'n. 14-15.  They allege that Goodman orally "issued a
nonexclusive, nontransferable, royalty-free license to Solid Gold, permitting it to use the marks at
this San Francisco location," GDO ¶ 6, and argue that the phone call that Furnelli admitted that he
received from Kaplan stating that Kaplan "disavowed any interest in operating in California . . .
and did not object to Solid Gold's operating under the GOLD CLUB name or mark" constitutes a
license, Furnelli Decl. ¶ 8.  For the reasons stated earlier, the Court cannot credit the declarations
on this issue at this juncture.  It is noteworthy that the defendants also provide scant evidence from
the interceding years that supports the existence of such a license.

16

The defendants argue that, because the plaintiff is PML Clubs's licensee, the doctrine of licensee estoppel bars the plaintiffs from contesting PML Clubs's rights.  In *Pacific Supply Co-op. v. Farmers Union Central Exchange Inc.*, 318 F.2d 894, 908 (9th Cir. 1963), the Ninth Circuit articulated "the long settled principle of law that a licensee . . . of a trademark . . . may not set up any adverse claim in it as against its licensor.  Such use as a recognized licensee . . . sets up no rights in that licensee adverse to the terms of the license."  However, such an argument—if it applies here—depends on the existence of a license, and the Court cannot make such a determination based on this record.

The defendants argue that the plaintiff "has admitted in pre-litigation statements celebrating its anniversaries of operation" that it "was not organized, and did not exist, until September 2003."  Opp'n 10 (citing Guillot Decl. Ex. 15).  At this juncture, the anniversaries do not constitute admissions because, as the plaintiff contends, those anniversary celebrations are arbitrary in their dates and only refer to the year in which the plaintiff purchased Gold Club-SF from Solid Gold.  NCBD ¶ 12.

## II.     IRREPARABLE HARM, BALANCE OF EQUITIES, AND THE PUBLIC INTEREST

"An irreparable harm is one that cannot be redressed by a legal or equitable remedy following trial."  *Optinrealbig.com. LLC v. Ironport Sys.*, 323 F. Supp. 2d 1037, 1051 (N.D. Cal. 2004).  "In some instances, damage to reputation or goodwill, because it is difficult to calculate, qualifies as irreparable harm."  *Premier Nutrition, Inc. v. Organic Food Bar, Inc.*, 475 F. Supp. 2d 995, 1007 (C.D. Cal. 2007).  However, broad or vague claims that the plaintiff "may experience a loss of good will and customer confusion" due to the defendants' actions are insufficient to establish a likelihood of irreparable harm.  *Id.*

The plaintiff has not sufficiently shown a likelihood of irreparable harm.  It argues that customers will be confused and its reputation may be damaged by the defendants' continued use of confusingly similar marks.  Br. 21.  While there is a possibility of damage to the plaintiff's intangible interests, its primary damage is monetary and compensable.  The plaintiff does not allege that Platinum SJ's club is of significantly inferior quality and is therefore harming the

United States District Court
Northern District of California

1  plaintiff's reputation as a high-end gentlemen's club. Thus, any damage may be assessed by

2  considering the diversion of customers over time should the plaintiff succeed in this case.

3        The plaintiff points out that the Ninth Circuit has held that "irreparable injury may be

4  presumed from a showing of likelihood of success on the merits of a trademark infringement

5  claim." *Brookfield Commc'ns*, 174 F.3d at 1066. However, as the plaintiff rightly acknowledges,

6  a number of courts have cast doubt on the continuing viability of that rule, including judges in this

7  district. *See, e.g.*, *Rovio Entm't Ltd. v. Royal Plush Toys, Inc.*, No. 12-cv-5543-SBA, 2012 WL

8  5936214, at *5 (N.D. Cal. Nov. 27, 2012) ("district courts in this Circuit that have addressed this

9  issue have found that the governing law has changed, and a plaintiff is not granted the

10  presumption of irreparable harm upon a showing of likelihood of success on the merits");

11  *BoomerangIt, Inc. v. ID Armor, Inc.*, No. 12-cv-0920-EJD, 2012 WL 2368466, at *4 (N.D. Cal.

12  June 21, 2012) ("this court will not assume the existence of irreparable injury due to a showing of

13  success on the merits"). The Ninth Circuit has overruled similar presumptions in the copyright

14  and patent contexts, which supports the argument that such a presumption may no longer be valid

15  in the trademark context. *Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 994, 998

16  (9th Cir. 2011); *Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 979–981 (9th Cir. 2011). But in

17  any event, the Court need not decide that issue because the plaintiff has only made a showing of

18  serious questions going to the merit, not that it is likely to succeed on the merits. Thus, even if

19  that principle remains viable, the plaintiff would not be entitled to any presumption.

20        Further, the plaintiff has not shown that the balance of hardships tips "sharply" in its favor.

21  Where there are only "serious questions going to the merits," the moving party must show that

22  "the balance of hardships tips sharply in [its] favor." *Graham*, 2013 WL 3989676, at *1 (citing

23  *Cottrell*, 632 F.3d at 1131). "In evaluating the balance of hardships a court must consider the

24  impact granting or denying a motion for a preliminary injunction will have on the respective

25  enterprises. Thus the relative size and strength of each enterprise may be pertinent to this

26  inquiry." *Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 827 (9th Cir. 1993).

27        Here, the plaintiff describes itself as a "well-known gentlemen's club" that "has acquired

28  recognition and fame" over 18 years. Br. 1. It provided evidence that its customer volume

United States District Court
Northern District of California

18

1  increased significantly through the years to over 100,000 customers annually.  Having operated

2  continuously in San Francisco since 1995, its reputation is likely secure.  On the other hand, San

3  Jose Gold Club is a new business trying to build itself.  Platinum SJ has spent a significant amount

4  of money to plan and promote its club.  Wolfes Decl. ¶¶ 4-7.  Requiring it to change its name and

5  operations so early in its infancy would have a significantly negative impact on its business.  The

6  balance of hardships does not tip "sharply" in the plaintiff's favor; indeed, it appears to the Court

7  that the San Jose Gold Club would suffer far greater injury if it had to change its name at this

8  juncture than Gold Club-SF would be damaged if the injunction is denied.

9      Finally, there is a public interest in enforcing valid trademarks and preventing consumer

10  confusion.  On this record, however, it is too early to tell which party will prevail.  The public-

11  interest factor does not favor either side.

<strong>CONCLUSION</strong>

13      After considering the parties' evidence, briefs and argument, and weighing the relevant

14  factors, the Court DENIES the motion for a preliminary injunction.  Because of the serious

15  questions raised by the motion, the Court will expedite the trial of this matter and orders the

16  parties to submit a proposed expedited schedule by September 23, 2013.

17      **IT IS SO ORDERED.**

18  Dated: September 18, 2013

_____

20  WILLIAM H. ORRICK
    United States District Judge

United States District Court
Northern District of California